GORDON *v.* CITY OF WARREN PLANNING &
URBAN RENEWAL COMMISSION

OPINION OF THE COURT

1. JUDGMENT—CONSENT JUDGMENT—MUTUAL MISTAKE—MODIFICA-
TION.

> A consent judgment, like all contracts and judgments, is subject
> to the power of the courts to modify and vacate in order to
> correct a mistake.

2. CONTRACTS — CONSTRUCTION OF CONTRACTS — MISTAKE — IMPOS-
SIBILITY — PRESUMPTIONS.

> An agreement impossible of performance because of facts exist-
> ing at the time it was entered into of which the parties were
> ignorant may be avoided without regard to who furnished the
> erroneous information, if the agreement was based upon the
> supposed possibility of performance, even though the person
> pleading the mistake had the means of discovering it or by
> care and diligence might have avoided it, since it is presumed
> that parties contract with reference to the existence of a state
> of things making performance possible.

3. CONTRACTS—MISTAKE—UNDERLYING ASSUMPTIONS.

> The doctrines of mistake, innocent misrepresentation, impos-
> sibility, failure of consideration, and no-meeting-of-the-minds

REFERENCES FOR POINTS IN HEADNOTES

[1, 4]  46 Am Jur 2d, Judgments §§ 688, 690, 717.
[2]  17 Am Jur 2d, Contracts § 404 *et seq.*
[3]  17 Am Jur 2d, Contracts §§ 86, 87, 143, 397–399, 404.
[5, 6]  58 Am Jur, Zoning § 178.
[7]  58 Am Jur, Zoning § 2.
  26 Am Jur 2d, Eminent Domain § 71.
[8, 9]  58 Am Jur, Zoning § 178.
  26 Am Jur 2d, Eminent Domain §§ 150, 153.
[10]  47 Am Jur 2d, Judgments § 1080.
[11, 12]  46 Am Jur 2d, Judgments § 717.
[13, 15]  46 Am Jur 2d, Judgments §§ 897, 1088.
[14]  4 Am Jur 2d, Appeal and Error § 116.

are aspects essentially of the same fundamental jural principle, that the parties to a contract ordinarily have not agreed to take the risk of the falsity of the undoubted underlying assumptions upon which the contract is based.

4. JUDGMENT—VACATION OF JUDGMENT—MUTUAL MISTAKE.

A judgment embodying the agreement of plaintiff builders and defendant city planning commission to build multiple dwellings located as shown on a revised site plan was founded on mutual mistake and the plaintiffs entitled to relief from the judgment, where plaintiffs agreed to locate two buildings outside the boundary lines of a proposed widening of an existing road as shown on the site plan but the site plan, because of a mistake of plaintiff's consultant, erroneously made it appear that there was a greater amount of land available for both the buildings and the proposed widened road than was really available, even though the mistake was caused by a consultant hired by plaintiffs and was eventually recognized by one of plaintiffs' employees who was in charge of construction, but no one was aware of the significance of the mistake until some time after construction was begun and both parties were under the mistaken impression that the two buildings would and could be built outside the boundaries of the widened road.

5. MUNICIPAL CORPORATIONS—PLANNING COMMISSION—MASTER PLAN —STATUTES.

A municipal planning commission has no general power under the statute concerning its creation, powers, and duties, to prevent construction or uses of nonpublic buildings inconsistent with their master plans (MCLA § 125.31 *et seq.*).

6. MUNICIPAL CORPORATIONS — PLANNING COMMISSION — POWERS — STATUTES.

Statute conferring upon a city planning commission such powers as may be necessary to enable it to fulfill its functions, to promote municipal planning, or to carry out the statutory purposes, cannot properly be read as a roving commission to do whatever the commission thinks is in the public interest in regard to the use of land, without any review even by the city's legislative body as to the commission's specific exercises of that broadly-worded authority (MCLA § 125.41).

7. MUNICIPAL CORPORATIONS—STATUTES—ZONING ENABLING ACT— HOME RULE ACT—CONSTITUTIONAL LAW.

The zoning enabling act and the home rule act were not intended by the legislature to confer upon cities the authority to require

that land be set aside for roads and streets because private property, except in extraordinary circumstances, cannot be appropriated without compensation under the police power.

8. Municipal Corporations — Police Power — Zoning — Constitutional Law.

The state may not constitutionally require a property owner to refrain indefinitely and without payment from using and enjoying his property in the name of the police power, and the legislature, when it adopted zoning enabling legislation, did not authorize local governmental units to use the police power to require the reservation of property that a public authority might some day wish to condemn.

9. Zoning—Ordinances—Municipal Corporations—Building Setbacks—Constitutional Law—Compensation.

A zoning ordinance prohibiting the erection or construction of any building or structure within the area of defendant city's master thoroughfare plan and requiring all setbacks to be measured from the proposed right of way established by the master plan for possible future construction may be unconstitutional because, in effect, it required plaintiff landowners to dedicate a substantial portion of their property to public purposes without any provision for compensation.

### Dissent by Holbrook, J.

10. Judgment—Consent Judgment.

*A judgment order embodying the agreement of plaintiff builders and defendant city planning commission as to location of plaintiffs' buildings on a building site plan was a consent judgment where the parties proffered it to the court for signature and the court had entered it of record.*

11. Judgment—Consent Judgment—Mistake—Substance.

*A mistake in a revised building site plan, which erroneously contained an additional 69 feet in the existing right of way of a road abutting the site was not a mistake of substance inasmuch as plaintiff builders were not prevented by the error from carrying out a judgment incorporating the revised site plan requiring them to construct their apartment buildings a specified number of feet from the west edge of the existing right of way, where everyone knew where the west edge was located because it could be seen.*

12. Judgment—Consent Judgment—Modification—Mistake.

    *A mistake, in order to justify a setting aside or reformation of a consent judgment, must go to the substance of the judgment and agreement upon which it was based.*

13. Judgment—Consent Judgment—Enforcement—Appeal and Error.

    *A judgment which in effect enforced the terms of the parties' original consent judgment was as binding upon the parties as the consent judgment, and consequently plaintiffs could not attack it on appeal because it stood in the same position as the original consent judgment so far as plaintiffs' appeal from it was concerned.*

14. Appeal and Error—Issues.

    *The issue whether defendant city planning commission had the legal right to prevent plaintiff builders from developing their land within a proposed future highway right of way was not decided by the trial court, and therefore the Court of Appeals should not consider it where the original judgment was a consent judgment, the breach of which by the plaintiffs constituted the subject matter of the proceedings from which the appeal was taken.*

15. Judgment—Consent Judgment—Enforcement—Discretion.

    *The trial judge properly exercised his discretion in ordering plaintiff builders to remove two partially-constructed buildings from the path of a proposed road-widening project where the building location was contrary to a revised site plan which plaintiffs and defendant city planning commission had incorporated into a consent judgment and the removal order was simply an enforcement of the original judgment.*

Appeal from Macomb, Walter P. Cynar, J. Submitted Division 2 January 8, 1970, at Lansing. (Docket No. 8372.) Decided January 12, 1971. Leave to appeal granted April 14, 1971. 384 Mich 827.

Complaint for mandamus by Harold Gordon and Louis P. Begin against the City of Warren Planning and Urban Renewal Commission to compel approval of low-rise multiple dwelling plan. Consent judgment entered. Complaint for injunction by the City of Warren Planning and Urban Renewal

Commission against Harold H. Gordon and Louis P. Begin to compel plaintiffs to remove buildings from highway right of way and to prevent further construction. Injunction granted. Plaintiffs appeal. Reversed.

*Roy W. Rogensues,* for Harold Gordon.

*Kenneth R. McAlpine,* for Louis P. Begin.

*Emil E. Cardamone,* City Attorney, and *John J. Murray,* Assistant City Attorney, for the City of Warren.

Before: LEVIN, P. J., and HOLBROOK and BRONSON, JJ.

LEVIN, P. J.  The plaintiffs owned a 15–1/2 acre site upon which they desired to construct low-rise multiple dwellings.  They submitted a site plan to the defendant City of Warren Planning and Urban Renewal Commission and, when that body failed to approve the plan, commenced this action.  At the conclusion of a hearing the trial judge indicated that he would probably grant the plaintiffs relief, but suggested that the parties attempt to relocate some of the proposed buildings outside the path of a proposed widening of Mound Road, which abuts the easterly boundary of the site.

The parties entered into an agreement, which was embodied in a judgment, to relocate two of the proposed buildings outside the path of the proposed widening of Mound Road.

Due to a mistake by a planning consultant employed by the plaintiffs it appeared that there were 69 more feet in the existing right-of-way than there actually is; since the 69 feet does not exist, 69 addi-

tional feet will have to be taken from the site if Mound Road is ultimately widened.

The plaintiffs would not have entered into the agreement unless all the buildings could be constructed, and the two buildings in question could not be constructed on the site outside of the proposed right-of-way and the required setback therefrom without the 69 feet because there is not enough land west of the setback line upon which to construct them.

We conclude that the agreement was based on a mutual mistake and set aside the agreement and judgment, and adjudicate the rights of the parties as if there had been no agreement or judgment.

## I.

Mound Road is now 204 feet wide. The state highway department has plans to widen it by 200 feet but when or whether those plans will be implemented is uncertain. If they are, the entire 200 feet will be taken on the west side, plaintiffs' side, of the road as it crosses plaintiffs' property. Under the plan as originally submitted by the plaintiffs, buildings 1, 2, 3 and 6 would be located in the path of the proposed widened road.

Pursuant to the judge's suggestion the parties met and it was decided that all four buildings could not be relocated west of the 40-foot city-ordinance-required setback from the widened road but that two buildings, 3 and 6, could be relocated west of a line 240 feet from the existing west boundary of Mound Road—200 feet for the new right-of-way and 40 feet for the setback. It was thereupon agreed that buildings 1 and 2, the two buildings closest to Mound Road, would be built as shown on the site plan originally submitted but that buildings 3 and

6 would be relocated west of the 240-foot line. A revised site plan was drawn and a judgment was entered providing that the plaintiffs may construct the buildings in accordance with the revised site plan.

Construction was begun and then it was discovered that buildings 3 and 6 were in fact being built east of the 240-foot line.[1] The site plan submitted by the plaintiffs was rechecked. It shows the center line of Mound Road and the east section line of Section 5[2] to be coincident. In fact, the center line of Mound Road is 69 feet west of the east section line.

The person in charge of construction for the plaintiffs, while aware that the two lines did not coincide, was not aware of the settlement. Faced with the ambiguity implicit in the fact that the site plan showed that the east property line was 171 feet west of both the center line of Mound Road and the east section line, he located the actual construction sites in relation to the east section line rather than the center line, *i.e.*, he decided to construct the buildings 69 feet closer to the center of Mound Road than shown on the plan which, however, was no closer to the east section line than shown on the plan.[3]

The defendant sought an injunction restraining the plaintiffs from continuing with construction and requiring that they remove the partially-completed buildings. After a testimonial hearing the judge ruled that buildings 1 and 2 (which it was contemplated under the agreement reached by the parties

---

[1] The east lines of the buildings as constructed were 184 feet (for building 3) and 195 feet (for building 6) west of the present west line of Mound Road. Buildings 1 and 2 were also being constructed closer, 69 feet closer, to the present west line of Mound Road than the parties expected.

[2] Plaintiffs' property is located in Section 5.

[3] It is entirely understandable that he would so decide because, without the 69 feet, buildings 3 and 6 could not be built at all. And it is apparent that it was contemplated that they would be built.

would have to be condemned if Mound Road is widened) could remain provided that buildings 3 and 6, which under the agreement were to be located west of the 240-foot line, were first removed.

The plaintiffs appeal claiming that the judge should have modified the judgment he originally entered because it was based on a mutual mistake, and because the defendant had no legal right to prevent the plaintiffs from locating structures within the area of the proposed expansion of Mound Road. The plaintiffs alternatively contend that the judge, in the proper exercise of his discretion, should have refused to require the removal of partially completed buildings 3 and 6.

We are satisfied that the judgment was based on a mutual mistake, and that plaintiffs should be relieved of the judgment and the question of the defendant's right to prohibit the construction of buildings within the path of the proposed widening of Mound Road decided on its merits. On the merits we conclude that the city is not authorized to prevent the construction of these buildings even though their construction will add to the cost of condemning the land upon which they are constructed if the land is required for the widening of Mound Road.

Accordingly, there is no need to reach the question whether the judge should, as a matter of discretion, have refused to order the removal of partially constructed buildings 3 and 6.[4]  Nor do we see any

---

[4] *Cf. Township of Pittsfield* v. *Malcolm* (1965), 375 Mich 135, and *Township of Farmington* v. *Scott* (1965), 374 Mich 536, 540, where the Michigan Supreme Court declared that a circuit judge is not obliged to issue an injunction requiring abatement as a nuisance of a use invalid under a zoning ordinance if "the entire circumstances, viewed together, present compelling reasons why equity should refuse plaintiff's request for injunction," *Township of Pittsfield* v. *Malcolm supra*, p 148; see, also, Mr. Justice BLACK's separate concurring opinion in that case.

Additionally, see *Bingham* v. *City of Flint* (1968), 14 Mich App 377, 385; compare 42 Am Jur 2d, Injunctions, § 58, p 801, concern-

need to decide whether, as defendants contend and the judge found, the judgment originally entered was a consent judgment.

## II.

Even if the judgment was a consent judgment and, therefore, is contractual as well as adjudicatory in nature,[5] it, like all contracts[6] and judgments,[7] is subject to the power of the courts to modify and vacate in order to correct a mistake.

"A mistake may be such as to constitute sufficient cause for opening, modifying, or vacating a judgment, * * * The rule prevails in the case of a judgment * * * by consent, which has been held subject to modification so as to indicate the real intention of the parties. There is also authority for the proposition that a mistake of one of the parties is sufficient to afford relief against a consent judgment." 46 Am Jur 2d, Judgments, § 717, pp 870, 871.[8]

It is also established that an agreement, impossible of performance because of facts existing at the time it was entered into of which the parties were ignorant, may be avoided if the agreement was based upon the supposed possibility of performance without regard to who furnished the erroneous information and even though the person pleading the mis-

---

ing the application of the doctrine of comparative injury in cases where a mandatory injunction is sought.

[5] See 47 Am Jur 2d, Judgments, § 1082, pp 140, 141; 7 Callaghan's Michigan Pleading and Practice, § 45.03.

[6] See 17 Am Jur 2d, Contracts, § 143, *et seq.*

[7] See 46 Am Jur 2d, Judgments, § 717, p 870, *et seq.*

[8] See, also, *Hews* v. *Hews* (1906), 145 Mich 247, 256; *Vincent* v. *Matthews* (1887), 15 RI 509 (8 A 704); *Brick* v. *Brick* (1887), 65 Mich 230; *Horning* v. *Saginaw Circuit Judge* (1910), 161 Mich 413, 414; *Sauer* v. *Rhoades* (1954), 338 Mich 679, 681; 49 CJS, Judgments, § 330(b), p 602. A settlement was set aside for mistake in *Farhat* v. *Rassey* (1940), 295 Mich 349; although the settlement in that case was not embodied in a court order, surely a court's responsibility to correct a mistake cannot be less where it has joined in the mistake.

take had the means of discovering it or by care and diligence might have avoided it. "It is presumed that parties contract with reference to the existence of a state of things making performance possible." 17 Am Jur 2d, Contracts, § 144, p 491.[9]

If, as mistakenly shown on the site plan, the center line of Mound Road and the east section line of Section 5 coincided, then the existing right-of-way would be 171 feet wide, i.e., 69 feet wider than the 102 feet presently devoted to the west lane of Mound Road. On that assumption, only 131 additional feet would be required to provide 200 feet for the widening of Mound Road. And if that were the fact, only 131 feet of plaintiffs' property would have to be condemned and the 240-foot line (the line 240 feet west of the west line of the present Mound Road) would be only 171 feet[10] west of the east property line of the project. The parties thought those were the facts. They were not the facts; in fact the 240-foot line was 240 feet—not 171 feet—west of the east property line.

---

[9] *Gibson* v. *Pelkie* (1877), 37 Mich 380; *McKay* v. *Coleman* (1891), 85 Mich 60; *Kroninger* v. *Anast* (1962), 367 Mich 478, 481, 482; *State Savings Bank of Ann Arbor* v. *Buhl* (1901), 129 Mich 193; *Eberle* v. *Heaton* (1900), 124 Mich 205, 209; *Richardson Lumber Co.* v. *Hoey* (1922), 219 Mich 643, 648–650; *Abbott Voting Machine Co.* v. *City of Eaton Rapids* (1911), 165 Mich 625. As appears from an examination of these Michigan cases, the doctrines of mistake, innocent misrepresentation, impossibility, failure of consideration and no-meeting-of-the-minds are aspects essentially of the same fundamental jural principle: the parties to a contract ordinarily have not agreed to take the risk of the falsity of the undoubted underlying assumptions upon which the contract is based.

Similarly, see *Enequist* v. *Bemis* (1947), 115 Vt 209 (55 A2d 617, 1 ALR2d 1); *Faria* v. *Southwick* (1959), 81 Idaho 68 (337 P2d 374); *Paddock* v. *Mason* (1948), 187 Va 809 (48 SE2d 199).

Relief has also been granted to a contracting party who made a unilateral mistake in the formation of the contract. *Kutsche* v. *Ford* (1923), 222 Mich 442.

[10] This 171-foot dimension is the sum of the 40-foot setback and the 131 additional feet required in that hypothesis, *i.e.*, based on the assumption that the present right-of-way is 69 feet wider than the 102 feet in use for the west lane.

Thus the parties thought they had 69 feet more within the interior of the project to locate two of the buildings than they in fact had.   The defendant contends that its expectation that buildings 3 and 6 would be built west of the 240-foot line should be protected.   The plaintiffs contend, however, that they only agreed to build buildings 3 and 6 west of the 240-foot line because they thought that the 240-foot line was only 171 feet west of the east property line.

It is entirely true that the defendant was not aware of the mistake as to the location of the center line of Mound Road.   It is also true that one of plaintiffs' construction personnel was aware of that fact.   It is also undisputed that a planning consultant employed by the plaintiffs made the mistake of assuming that the center line of Mound Road and the east section line of Section 5 coincided and caused the site plan to be drawn showing this to be the case.[11]

But, while one of the plaintiffs' construction personnel knew that the center line of Mound Road was 69 feet west of the east section line, it is not claimed that the significance of this fact in relation to the agreement was known to anyone including the plain-

---

[11] The testimony and exhibits introduced into evidence tend to show how the mistake occurred.   As originally established, the center line of Mound Road (then 66 feet wide) coincided with the east line of Section 5.   When Mound Road was widened to its present 204 feet the entire additional 138 feet was taken from the west side of Mound Road, not 69 feet from each side; thus the center line of old Mound Road was moved westerly 69 feet to its present location.   Accordingly, while the east section line is 171 feet from the west line of Mound Road (the east property line) the present center line of Mound Road is only 102 feet east of the east property line.   The planning consultant engaged by the plaintiffs was unaware that the entire additional 138 feet required for that widening of Mound Road was take from the west side of Mound Road; he mistakenly assumed that 69 feet was taken from each side and on that assumption drew the site plan showing that the center line of Mound Road remained where it was originally located, i.e., coincident with the east line of Section 5.

tiffs or any of their employees until the mistake was discovered some time after construction was begun. It is not claimed that when the plaintiffs agreed to relocate buildings 3 and 6 they or anyone else knew that their expectations and the expectations of the defendant could not both be fulfilled.

Indisputably the defendants entered into the agreement for the relocation of buildings 3 and 6 with the purpose of having them located west of the 240-foot line. It is equally indisputable, however, that the plaintiffs would not have entered into the agreement unless buildings 3 and 6 could be built, and buildings 3 and 6 could not be built west of the true 240-foot line because without the 69 feet there is not enough land west of the 240-foot line upon which to construct them.[12]

The agreement was based upon the mutual mistake that buildings 3 and 6 could be relocated outside of the 200-foot path of the proposed widening of Mound Road and the 40-foot setback from the widened road.

### III.

Where an agreement or judgment is entered based on a mistake, the appropriate remedy will depend on the facts and circumstances of the case.[13] Here we think that the sound and appropriate disposition is to set aside the agreement and judgment and to

[12] Judge HOLBROOK, in his opinion, writes that "the error was not vital nor did it in any manner prevent the plaintiffs from carrying out the terms of the revised site plan". However, under the trial court's last order the plaintiffs may construct only two of the four buildings in dispute; manifestly the plaintiffs are thereby prevented from constructing all the buildings contemplated under the revised site plan.

[13] In some cases the appropriate remedy will be rescission; in others restitution; in still others avoidance and setting aside of the contract or judgment. See cases cited in fn 9 and generally, 46 Am Jur 2d, Judgments, § 690, p 842, §§ 788, 789, pp 949–951, § 793, p 953; 49 CJS, Judgments, §§ 301–303, pp 554–556, § 307, p 560, § 330, pp 599–604.

analyze the rights of the parties as if they had not
been made and entered.   Accordingly, we now ad-
dress ourselves to the question whether the city had
the right to require the plaintiffs to set back 40 feet
from the proposed expanded Mound Road.

The city relies on § 4.36 of its zoning ordinance:

"4.36 Building Setbacks on Major Streets and
Highways
"(a) No building or structure shall be erected
or constructed within the area set down by the city's
master thoroughfare plan.
"(b) All setbacks, where required, shall be
measured from the proposed right-of-way estab-
lished by the city's master thoroughfare plan."

The parties seem to be in agreement that the
defendant planning commission did in fact adopt a
master thoroughfare plan showing that Mound Road
was or would be 300 or 350 feet wide.   The defend-
ant contends that this was sufficient notice that
Mound Road henceforth would be at least 150 feet
wide on each side and that, accordingly, no build-
ing could be lawfully constructed east of a line 190
feet (150 feet for Mound Road and 40-foot set back
from Mound Road) west of the center line of Mound
Road.   If this is true, then buildings 3 and 6, around
which most of the controversy in this litigation has
centered, could remain because they are located over
250 feet west of the center line of Mound Road.
However, buildings 1 and 2, the easterly boundary
of which is only 142 feet west of the center line
of Mound Road would be improperly located.

The plaintiffs challenge ordinance § 4.36 on the
ground that it unconstitutionally deprives the plain-
tiffs of all use of a portion of their property without
payment of fair compensation and also on the ground
that the state legislature has not authorized cities
to require property owners to locate new structures

with reference to contemplated future, but as yet not established, streets and highways.

We turn first to the question whether the state legislature has authorized cities to establish such a requirement. The parties have referred us to three acts, PA 1925, No 381; PA 1943, No 222; and PA 1931, No 285.

PA 1925, No 381 concerns inter-county super-and limited-access highways. Section 4 of that act provides for the establishment of an inter-county highway plan and for its recording after it has been approved by the governing bodies of each city and village affected. After the plan has been recorded no plat may be accepted which is not in conformity with the plan and "no structure shall be built on the land within the lines of any proposed highway except on a permit granted by the inter-county commission" which prepares the inter-county highway plan. It is not contended that Mound Road has been established in accordance with the provisions of Act 381.

PA 1943, No 222 authorizes planning commissions, after the adoption of a master plan, to certify plats of precise portions thereof to the legislative body and to regulate buildings within such lines. This act provides that after a city planning commission has adopted a master plan it may certify to the legislative body of the municipality "detailed and precised [sic] plats, each showing the exact location of the proposed future outside lines of 1 or more new, extended or widened streets, avenues, places or other public ways, or of 1 or more parks, playgrounds or other public grounds or extensions thereof shown on such adopted master plan".[14]

The act further provides that the legislative body of the city may adopt such a precise plat certified to it by the planning commission after notice to the

14 MCLA § 125.51 (Stat Ann 1969 Rev § 5.3007[1]).

owners of the land affected by the proposed precise plat,[15] and that the legislative body of the city may provide by ordinance that "no permit shall be issued for, and no building or structure or part thereof shall be erected on any land located within the proposed future outside lines of any new, extended or widened street, avenue, place or other public way, or of any park, playground or other public grounds or extension thereof shown on any such certified and adopted plat."[16]

During oral argument in our Court the defendant conceded that it could not show that the required notice to property owners had been given and, thus, it could not rely on Act 222 in this case.

We turn now to PA 1931, No 285,[17] concerning the creation, powers and duties of planning commissions. This act authorizes any municipality to adopt a "municipal plan * * * and create by ordinance a planning commission with the powers and duties herein set forth."[18] The act provides that the commission shall make and adopt a master plan for the physical development of the municipality, including, among other things, "the general location, character and extent of streets, viaducts, subways, bridges, waterways, flood plains * * *; also the removal, relocation, widening, narrowing, vacating, abandonment, change of use or extension of any of the foregoing ways, grounds, open spaces * * * ".[19] It is further provided that the "plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the municipality and its environs which will, in accordance with present and future needs,

---

[15] MCLA § 125.52 (Stat Ann 1969 Rev § 5.3007[2]).
[16] MCLA § 125.54 (Stat Ann 1969 Rev § 5.3007[4]).
[17] MCLA § 125.31 (Stat Ann 1969 Rev § 5.2991).
[18] MCLA § 125.32 (Stat Ann 1969 Rev § 5.2992).
[19] MCLA § 125.36 (Stat Ann 1969 Rev § 5.2996).

best promote health, safety, morals, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development; including, among other things, adequate provision for traffic".[20]

Planning commissions are not, however, given general power in Act 285 to prevent construction or uses inconsistent with their plans as in Acts 381 and 222 previously discussed. The discrete prohibitions in Act 285 provided are not applicable on the facts of this case:

The multiple dwellings constructed and under construction by the plaintiffs are not public buildings and, therefore, the plaintiffs are not subject to the commission's jurisdiction under § 9.

The authority provided in § 14 regarding the proper arrangement of streets in relation to other existing or planned streets is merely part of the regulations "governing the subdivision of land". The plaintiffs, the owners of 15–1/2 acres of land, did not submit a subdivision plan; they made no attempt to record a plat. They did not bring themselves within the provisions of §§ 13 and 14 concerning the subdivision of land and the regulation of the arrangement of streets.

It is true that under § 11 the commission has "such powers as may be necessary to enable it to fulfill its functions, promote municipal planning, or carry out the purposes of this act". That provision cannot properly be read as a roving commission to do whatever the commission thinks is in the public interest in regard to the use of land without, it will be observed, any review even by the city's legislative body as to the specific exercises of such broadly-worded authority.[21]

---

[20] MCLA § 125.37 (Stat Ann 1969 Rev § 5.2997).
[21] Section 9 (MCLA § 125.39 [Stat Ann 1969 Rev § 5.2999]

Also relevant is the city and village zoning enabling act[22] and the home rule act.[23]   The zoning enabling act provides that the legislative body of cities may "regulate and determine the area of the yards, courts, and other open spaces, and for such purposes divide any city or village into districts".[24] Section 4-i of the home rule act provides that the charter of a city may provide for the regulation by ordinance of, among other things, "required open spaces for light and ventilation of such buildings".

In *Ridgefield Land Co.* v. *City of Detroit* (1928), 241 Mich 468, the Supreme Court of Michigan ruled, in a case decided after the adoption of zoning enabling legislation, that the City of Detroit could require a property owner to dedicate additional land for the widening of Livernois Avenue and the establishment of a ten-foot building line on Pembroke

provides that after the adoption of a master plan no public buildings or structure may be built until it "shall have been submitted to and approved by the commission" but allows a public authority that desires to build the building to override the veto of the commission by the vote of two-thirds of its membership.

Section 10 (MCLA § 125.40 [Stat Ann 1969 Rev § 5.3000]) provides that resolutions of the legislative body opening, widening or extending any street may not be rescinded until the matter is referred to the planning commission for report and until after a public hearing and that the recommendation of the city planning commission can be overridden by the legislative body only by vote of not less than two-thirds of its entire membership.

Section 11 (MCLA § 125.41 [Stat Ann 1969 Rev § 5.3001]) provides that "the commission shall have such powers as may be necessary to enable it to fulfill its functions, promote municipal planning, or carry out the purpose of this act."

Section 13 (MCLA § 125.43 [Stat Ann 1969 Rev § 5.3003]) provides that after the adoption of a master plan relating to the major street system no plat of a subdivision of land shall be filed or recorded until it has been approved by the planning commission.

Section 14 (MCLA § 125.44 [Stat Ann 1969 Rev § 5.3004]) provides that in connection with the adoption of "regulations governing the subdivision of land" the planning commission may adopt regulations providing for the "proper arrangement of streets in relation to other existing or planned streets and to the master plan."

22 MCLA § 125.581 (Stat Ann 1969 Rev § 5.2931).

23 MCLA § 117.4i (Stat Ann 1970 Cum Supp § 5.2082).

24 MCLA § 125.582 (Stat Ann 1969 Rev § 5.2932).

Avenue *as conditions precedent to the approval of a plat.*[25]   The Court observed (pp 472, 473):

"here the city is not trying to compel a dedication. *It cannot compel the plaintiff to subdivide its property or to dedicate any part of it for streets.* It can, however, impose any reasonable condition which must be complied with before the subdivision is accepted for record. In theory, at least, the owner of a subdivision voluntarily dedicates sufficient land for streets in return for the advantage and privilege of having his plat recorded. Unless he does so, the law gives him no right to have it recorded. In *Ross* v. *Goodfellow,* 7 App DC 1, 10, 11, it is said:

" 'It must be remembered that each owner has the undoubted right to lay off his land in any manner that he pleases, or not to subdivide it at all. He cannot be made to dedicate streets and avenues to the public. If public necessity demands parts of his lands for highways, it can be taken only by condemnation and payment of its value. But he has no corresponding right to have his plat of subdivision so made admitted to the records.' " (Emphasis supplied.)

We are persuaded that the legislature did not intend when it adopted the zoning enabling act in 1921 and the pertinent provision in the home rule act in 1929 to confer upon cities the authority to require that land be set aside for roads and streets. Zoning regulation of the area of "yards, courts and other open spaces" is, as the home rule act expressly provides, largely intended to provide for adequate light and ventilation between structures. It also serves traffic safety, fire protection and aesthetic interests. Zoning is justified under the police power,[26] but, except in extraordinary circumstances, not present in

---

[25] Similarly, see *City of Corpus Christi* v. *Unitarian Church of Corpus Christi* (Tex Civ App, 1968), 436 SW2d 923.

[26] 58 Am Jur, Zoning, § 18, pp 950, 951.

this case, private property cannot be appropriated without compensation under the police power.[27]

The conceptual difference between requiring a yard setback for light and air (which the State need not pay for) and requiring that land be set aside for a public use (which, before it can be put to that use, the State must pay for) may not be readily explicable. It is, nevertheless, perfectly clear that there is a difference, a constitutional difference, between telling a property owner that he must provide space between his building and that of his neighbor and telling him to set aside land for possible future condemnation.

Just as the taking of property without payment cannot, except in extraordinary circumstances, be justified as an exercise of the police power, so too the State may not, in the name of the police power, require a property owner to refrain indefinitely and without payment from using and enjoying his property.[28] The Michigan legislature did not, when it adopted zoning enabling legislation, ignore this constitutional limitation; it did not authorize local units of government to use the police power to require the reservation of property that a public authority might some day wish to condemn.

## IV.

Our decision that there is no enabling legislation authorizing the defendant city to require that land be set aside for future roads and streets makes unnecessary decision on the constitutional issue posed by the plaintiffs of whether the legislature can authorize local units of government to block the use

---

[27] See 16 Am Jur 2d, Constitutional Law, §§ 368, 369, pp 698–700, § 301, pp 590–594.

[28] See *Arkansas State Highway Commission* v. *Anderson* (1931), 184 Ark 763 (43 SW2d 356).

of land when it is contemplated that at some future
time the land may be condemned for public purposes.
We are inclined to the view that the legislature
may confer such authority under carefully drawn
legislation, *e.g.*, legislation providing that such a
restriction of particular land cannot be adopted ex-
cept upon due notice to affected property owners,[29]
compensation for the deprivation of use, assurances
that the question whether the land will in fact be
condemned and its actual condemnation are resolved
within a reasonable period of time after the imposi-
tion of the restriction.[30]

The restriction relied on by the defendant city,
ordinance § 4.36, contains none of the safeguards
which we think might be necessary to sustain its
constitutionality.  The city's master thoroughfare
plan and the accompanying restriction on plaintiffs'
use of their property can be adopted without any
notice to the plaintiffs or any predecessor-owner.
There is no time limit for the resolution of the ques-
tion whether the land will in fact be condemned;
plaintiffs' property is indefinitely tied up, perhaps

---

[29] But see 1 Davis, Administrative Law Treatise, § 7.04, pp 420–
422.

[30] See, generally, Planning the Freeway:  Interim Controls in High-
way Programs, Duke L J (1964), p 439.

As to "inverse condemnation" see, generally, 27 Am Jur 2d,
Eminent Domain, § 478, p 411.

*Cf. Hilltop Properties, Inc.* v. *State of California* (1965), 233
Cal App 2d 349 (43 Cal Rptr 605), which held that inverse condemna-
tion was not shown, but allowed recovery of damages on a promis-
sory estoppel theory.

Also *Grand Trunk W. R. Co.* v. *City of Detroit* (1949), 326 Mich
387; *Carl M. Freeman Associates, Inc.* v. *State Roads Commission*
(1969), 252 Md 319 (250 A2d 250); *Henle* v. *City of Euclid* (1954),
97 Ohio App 258 (125 NE2d 355), holding that the zoning power
may not be used to reduce the cost of condemnation.

After this opinion was filed but before it was released by the
Reporter for publication, a pertinent annotation was published.  See
Anno:  Eminent Domain:  Validity of "Freezing" Ordinances or
Statutes Preventing Prospective Condemnee from Improving, or
Otherwise Changing, the Condition of His Property, 36 ALR3d 751.

perpetually, without any provision for compensation.

The defendant's ordinance in effect requires the dedication by the plaintiffs of a substantial portion of their property to public purposes without any provision for compensation; when and if a condemning authority ever gets around to condemning the land and paying compensation it could very well be on a basis considerably depreciated from what the land is presently worth—it might even then be contended without embarrassment that the plaintiffs' inability, because of the restriction, to use the land for any constructive purpose should affect the amount payable by the condemning authority.

Reversed; the injunction is dissolved.    Costs to plaintiffs.

BRONSON, J., concurred.

HOLBROOK, J. (*dissenting*).    After a careful reading of the majority opinion in this cause and believing that the result is based upon the consideration of issues not decided by the trial court, and upon the improper determination that the consent judgment contained a mutual mistake that was vital to the carrying out of its terms by the plaintiffs, this writer is constrained to respectfully dissent.

Plaintiffs are owners of land in the City of Warren, zoned for multiple-family dwellings since 1967. In July, 1968, plaintiffs submitted for approval a site plan for the construction of some 34 low-rise apartment buildings on this property to defendant, City of Warren Planning and Urban Renewal Commission.    In November, 1968, plaintiffs filed a complaint for writ of superintending control in Macomb County Circuit Court, alleging that defendant was wrongfully withholding approval of their site plan.

A hearing was held by the court, and the defendant asserted that four of the buildings were situated too close to Mound Road; that the Michigan State Highway Department had proposed to build an expressway over Mound Road and that this proposed expressway had been incorporated into the City of Warren's master thoroughfare plan. Further, that this improvement would require an additional *200 feet of right-of-way on the west side of Mound Road,* and this improvement was scheduled to be commenced in 1971 or 1972. The defendant objected to any action on the part of the plaintiffs that would require the city to pay on condemnation for the cost of these buildings in addition to the land itself. The matter was adjourned for a week for the purpose of the parties getting together and settling their differences. At the end of the week, the plaintiffs and the defendant proffered a judgment to the court for signature. This judgment gave plaintiffs the right to build their low-rise apartment buildings in accordance with plaintiffs' revised site plan dated January 9, 1969. It permitted plaintiffs to place two of the buildings *within the 200 feet,* but the other two buildings were to be placed so that they would not need to be condemned when the improvement of Mound Road became necessary.

The plaintiffs proceeded immediately to build and the city inspectors discovered that the setback lines for buildings 1, 2, 3 and 6 were not in accord with the revised site plan, and defendant thereupon filed a petition for the enforcement of the judgment, by injunction. An order to show cause directed to plaintiffs was issued. Plaintiffs filed a petition to modify and clarify the judgment. A lengthy hearing was held in considering the petitions of the parties, and at the conclusion thereof, the trial judge decided the matters before him in a thorough written opin-

ion.  Because the learned trial judge's opinion is
consonant with this writer's ideas of what our deci-
sion in this case should be, and because it also deter-
mines correctly all issues of fact, it is adopted as a
part of this opinion and repeated herein as follows:

"The plaintiffs filed a complaint for writ of super-
intending control contending that they were land
contract vendees of a parcel of land in the City of
Warren, on which land they were proposing to con-
struct low-rise apartments, and that they did sub-
mit a site plan to the defendant on July 26, 1968, for
approval; however, the City of Warren Planning
and Urban Renewal Commission refused to give such
approval.  The hearing on order to show cause took
place on January 13, 1969, in open court.  The plain-
tiffs called Jerome R. Schmeiser, who testified that
the site plan, as submitted by the plaintiffs, and the
drawing, submitted by the highway department, as
presently drawn, indicate that 200 feet of right-of-
way would be needed in addition to the 200 foot
right-of-way in existence for the proposed construc-
tion of a super-expressway on Mound Road; the
timetable for acquisition of the 200 foot right-of-way
to begin sometime in 1971 or 1972.  The testimony
is clear that the 200 foot right-of-way would be ac-
quired off the west side of the present Mound Road
right-of-way.  Assuming that the 200 foot right-of-
way was acquired across the front of the project,
four buildings as proposed under the plaintiffs' site
plan would be within this proposed right-of-way,
each building having eight units and each unit cost-
ing, exclusive of land costs, approximately $12,000
to $14,000.  The record reflects that inquiry was
made into the possibility of relocating the four front
buildings in order to reduce further condemnation
costs.  A question arose whether or not relocating
four units would be in violation of the ordinance
insofar as it related to density.  Keeping in mind
that this was a matter in the nature of an equity

proceeding, an effort was made to have the parties attempt to resolve the problem through negotiation; and the hearing was adjourned for one week to allow the parties an opportunity in attempting to work out a solution. Otherwise, this court indicated that the petitioners' request would be granted.

"On January 20, 1969, this court signed what is entitled judgment order. In effect, the proper title should have been consent judgment, since this court in no way formulated the judgment or ruled on its contents or ever saw, prior to signing this judgment, the so-called revised site plan dated January 9, 1969, which is incorporated as part of the judgment. This judgment order was typed on stationery of plaintiff counsel and submitted and approved by counsel for both plaintiffs and defendants.

"On September 26, 1969, the defendant filed a complaint for injunctive relief and an order to show cause why buildings should not be removed from the proposed right-of-way. The sworn complaint, signed by Jerome R. Schmeiser, Director of Planning and Urban Renewal Commission, alleges that on January 20, 1969, this court allowed the plaintiffs to build their multifamily project in accordance with plaintiff's revised site plan dated January 9, 1969. The defendant recites that under the revised site plan of 1/9/69, plaintiffs were to build two apartment buildings each containing eight apartment units, a total of 211 feet from the centerline of Mound Road to the front building line, and that the *second tier or [sic] apartment buildings was to be built 280 feet from the existing Mound Road right-of-way.* Further, plaintiffs violated the court order by failing to build the brick wall along Beebe Street by allowing an entrance to said project off Beebe Street. It was contended that to allow the plaintiffs to continue to complete the construction of the said apartment buildings, large sums of money will be expended to condemn said buildings when the widening of Mound Road occurs. No answer has been filed to

this sworn complaint.[1]   Testimony and arguments in conjunction with the order to show cause and the petition to clarify and modify judgment order was heard over a number of days, the hearing being concluded on Friday, October 10, 1969.

"Plaintiffs called Jerome Schmeiser to the stand and his testimony indicated that a stop order has been placed on construction of the four front buildings because all four buildings were being constructed within the proposed right-of-way.   The front of buildings numbered 1 and 2 *were within 40 feet of the Mound Road right-of-way or 142 feet from the center of Mound Road.   The front of buildings numbered 3 and 6 on the north were 184'4" from the Mound Road right-of-way and 195'4" on the south from the Mound Road right-of-way.*   While acknowledging that the approved site plan of 1/9/69 does have a line running north and south dividing the Mound Road right-of-way to 102 feet to the west of this line and 102 feet to the east of this line, there is also writing along this so-called centerline which reads, 'east line of Section 5'.   This witness acknowledged that it was only recently that he learned that the east line of Section 5 and the so-called centerline of Mound Road are not identical as indicated on the said site plan and that the east line of Section 5 is actually 69 feet to the east of the centerline of the Mound Road right-of-way.   All the same, it was this witness's position that the marking 'east line of Section 5' on this site plan had no significance insofar as what was agreed to by both parties and the final resolution by entry of the judgment order together with the incorporated site plan.   It was this witness's position that all parties agreed through the judgment of 1/13/69 that the front of apartments 1 and 2 would be built a distance of 211 feet from the centerline of Mound Road *and the front of the*

---

[1] "Plaintiffs' answer to defendant's complaint for preliminary injunctive relief   *   *   *   was handed directly to the judge and not submitted to the clerk for filing directly."

*south tier of apartments 3 and 6 would be at least
240 feet from the most westerly edge of the Mound
Road right-of-way.*

"Plaintiffs' Exhibit 1 relates to the minutes of
January 6, 1969, of the Warren Planning and Urban
Renewal Commission at which time the Gordon-
Begin apartment development was discussed. It in-
dicates that Director Schmeiser was attempting to
work out some plan where the four front buildings
of the project could be fit in with the other buildings
so there would be a 300-foot setback from Mound
Road. Plaintiffs' Exhibit 2 relates to the Warren
Planning and Urban Renewal Commission meeting
of January 13, 1969, which meeting was concerned
with the revised site plan for the said apartments
and after lengthy discussions and presentations by
various commission members, Mr. Murray, Mr. Mc-
Alpine and Mr. Schmeiser, a motion to approve the
revised site plan was made and passed. The com-
mission approved the revised site plan with condi-
tions outline by the director and with an added con-
dition that two buildings in the M–53 right-of-way
be moved to the west outside of the right-of-way
and the other two buildings to remain in the right-
of-way with drawings submitted to the planning com-
mission for future reference. It might be noted that
among other conditions recited, a corporate surety
bond in the amount of $50,000 was to be posted by
the plaintiffs. Plaintiffs' Exhibit 6 is a letter to
Gordon-Begin and Company relating to the site plan
and conditions approved by the Planning and Urban
Renewal Commission on January 13, 1969, which let-
ter is signed by Jerome R. Schmeiser.

"Sentence No. 11 recites that the two buildings
in the M–53 right-of-way be moved to the west out-
side of the right-of-way and the other two buildings
to remain in the right-of-way.

"There has been much argument regarding the
centerline as indicated in the revised plan of 1/9/69
and the east line of Section 5 as indicated on the

same plan as not being one and the same. *This court finds, as a matter of fact, that while perhaps either counsel in this proceeding or Mr. Schmeiser may not have been aware that the east line of Section 5 was 69 feet to the east of the centerline of Mound Road, there is no question the plaintiffs did have such knowledge. Mr. Donald Geake, landscape architect and city planner, who drew up the proposed apartment layouts knew this to be so. Patrick McPharlin, the person in charge of the plaintiffs' construction, knew this to be so. An examination of the revised site plan of 1/9/69, the photographs and various exhibits, would bring to the average person at least a question regarding the distance away from the front of buildings 1 and 2 to the west edge of the Mound Road right-of-way.*

"Plaintiffs' Exhibit 11 is a series of building permits relating to this apartment housing project. This court cannot find that there was any unreasonable delay on the part of the city inspectors based on the dates of inspection noted on the building permit that would convince this court that persons in the Division of Building and Safety Engineering should have earlier initiated a stop order of the construction of buildings 1, 2, 3 and 6. As a matter of fact, by not only checking buildings 1 and 2 and 3 and 6 personally but also from the examination of the photographs in plaintiffs' Exhibit 3, there is an indication that all haste was used to commence the construction of the said buildings 1, 2, 3 and 6.

"Defendants subpoenaed Donald Clayton Geake, a landscape architect and certified city planner, who together with his associates prepared for the plaintiffs various proposed apartment layouts and site plans. He was instructed by plaintiff Begin, prior to January 9, 1969, to meet with Jerome Schmeiser of the planning commission, and was told that certain changes had come about, that there was additional widening to take effect and

that he was to go out, meet with Mr. Schmeiser, strike his peace with him and whatever Mr. Schmeiser come [*sic*] up with, the plaintiffs would conform with it.

"*After weighing all the proofs including the testimony of the witness Geake, this court rules, as a matter of fact, that apartment buildings 3 and 6 were to be constructed outside of any right-of-way lines, whether state or city or whatever. The facts established that the front of apartment buildings 3 and 6 were to be at least 240 feet west of the most westerly edge of the Mound Road right-of-way with an additional distance of 102 feet being from the most westerly edge of the Mound Road right-of-way to the center of Mound Road.*

"No purpose could be served at this time to discuss the efforts which have been made by counsel for the plaintiffs in attempting to argue that the judgment entered by consent on January 20, 1969, was other than a consent judgment. The plaintiffs implore that equity should come to their aid because apartment buildings 1 and 2 are more than 50 percent completed and to order them torn down would cause financial hardship. Time will tell whether plaintiffs themselves will be willing to dispense equity. Equity is not only on the side of the plaintiffs. Had a judgment been entered on a final determination by this court favorable to the plaintiffs, the defendant may have very well been entitled, prior to entry of judgment, to some type of equitable relief, least of which would be the posting of a corporate surety bond as a condition of the site plan approval by the Warren Planning and Urban Renewal Commission on January 13, 1969. Certainly, the defendant would have the right to follow appeal procedure if the decision had been favorable.

"This is a most difficult decision. However, after a great deal of study and deliberation, the following is ordered. In addition to all the applicable

pertinent codes and ordinances which shall continue to apply, the plaintiffs are to post a corporate surety bond in the amount of $50,000 assuring the city that the property will be developed in accordance with the approved site plan, elevations submitted and this determination. Further, the plaintiffs are to take immediate steps to remove buildings 3 and 6. After the plaintiffs comply with the above rulings, the plaintiffs may proceed to construct and complete buildings 1 and 2." (Emphasis supplied.)

The "judgment order" was properly construed by the trial court to be a consent judgment, under the facts in this case.

"A judgment by consent of the parties is a judgment the provisions and terms of which are settled and agreed to by the parties to the action in which it is entered, and which is entered of record by the consent and sanction of the court; * * * ." 49 CJS, Judgments, § 173, p 308.

The trial judge also correctly determined that the error on the revised site plan which placed the east line of Section 5 in the same position as the center line of Mound Road rather than correctly placing it 69 feet east of the center line of Mound Road, was not a mistake of substance. The error was not vital nor did it in any manner prevent the plaintiffs from carrying out the terms of the revised site plan. The revised site plan called for buildings 1 and 2 to be constructed 109 feet from the west edge of the existing Mound Road right-of-way; buildings 3 and 6 were to be constructed 253 and 264 feet respectively, from the west edge of Mound Road right-of-way. Everyone knew where the west edge of the right-of-way of Mound Road was located. It was there to be seen and it could not be mistaken. Contrary to the terms of the revised site plan,

plaintiffs placed buildings 1 and 2 142 feet west of the Mound Road right-of-way and buildings 3 and 6 were placed 184 and 195 feet respectively from the western edge of the existing Mound Road right-of-way. The mistake that plaintiffs rely on, *i.e.*, the placing on the revised site plan of the east side line of Section 5 and the center line of Mound Road in the same position was not a material mistake and did not justify the plaintiffs in relying upon it. The plaintiffs and their agents knew that the east side of Section 5 was 69 feet east of the center line of Mound Road. A mistake, in order to justify a setting aside or reformation of a consent judgment, must go to the substance of the judgment and agreement upon which it was based. *Stevenson* v. *Aalto* (1952), 333 Mich 582. It is perfectly clear that the location of the east boundary of Section 5, which was erroneously marked on the agreed-upon revised site plan, was tangential to the real substance of the revised site plan. The substance of the agreement in order to comply with the revised site plan was to locate the apartment buildings in relation to the Mound Road right-of-way. The boundaries of Section 5 were of no importance or at most of secondary importance. See *Harris* v. *Axline* (1949), 323 Mich 585.

In 1 Michigan Law & Practice, Appeal, § 42, p 538 it is stated in part as follows:

"Generally, a judgment entered by consent may not be complained of on appeal by the parties thereto, and an appeal from such judgment will be dismissed on motion. Such a judgment, entered on the agreement of the parties, is binding, and in the absence of a claim that consent to the judgment was not voluntarily given, or resulted from mistake, fraud or misrepresentation, the judgment may not be attacked on appeal."

In the instant case, the last judgment did in effect provide for the carrying out of the terms of the original consent judgment and it therefore stands in the same position as the original consent judgment as far as this appeal is concerned. *Dora* v. *Lesinski* (1958), 351 Mich 579. See also, *Cameron* v. *Smith* (1912), 171 Mich 333, 334; *Sauer* v. *Rhoades* (1954), 338 Mich 679; and *Knowlton* v. *City of Port Huron* (1959), 355 Mich 448, 456.

This writer has noted that the writer of the majority opinion has made reference to many figures in determining that there was a mutual mistake. A large number of reference figures does cause one to be confused but fails when it comes to convincing. If plaintiffs had placed apartment buildings 3 and 6 at least 240 feet from the right-of-way of Mound Road as the revised site plan required, the difficulty encountered in this cause would never have occurred. The trial judge in his deliberate and very careful manner correctly stated the facts in his opinion which fully justifies his determination of the matter.

The issue raised by plaintiffs to the effect that defendant did not have the legal right to prevent plaintiffs from developing their land within a proposed future right-of-way, is not properly before this Court. The original judgment being a consent judgment, it is inappropriate for this Court to consider this issue. The issue was not decided by the court below. This Court should only consider the consequences of plaintiffs' breach of the consent judgment since such breach constituted the subject matter of the proceedings from which this appeal is taken.

The other issue raised by plaintiffs poses the question of whether the trial court's order was a proper exercise of judicial discretion. The parties

agreed in the consent judgment that two of plaintiffs' buildings were to be located in the path of the future freeway and two outside of this area. Due to plaintiffs' failure to follow the revised site plan all four buildings were located within the proposed freeway right-of-way. The trial court felt that plaintiffs should bear the costs of their own carelessness but should be permitted to retain the two buildings which the consent judgment permitted them to place in the area in question. It was simply a carrying out of the terms of the original agreement as incorporated in the consent judgment.

For the reasons herein stated the judgment of the trial court should be affirmed with costs to the defendant.